GERALD METALS, INC., Plaintiff,

v.

The UNITED STATES, U.S. International Trade Commission, Defendant,

and

Magnesium Corporation of America, International Union of Operating Engineers, Local 564, and United Steel Workers of America, Local 8319, Defendant–Intervenors.

Slip Op. 96–142.
Court No. 95–06–00782.

United States Court of International Trade.

Aug. 21, 1996.

Frederick P. Waite, Joseph Brooks, Denise Cheung (Popham, Haik, Schnobrich & Kaufman, Ltd), Washington, DC, for Plaintiff.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Andrea C. Casson, Attorney for Defendant, Office of the General Counsel, U.S. International Trade Commission.

Charles M. Darling, IV, Michael X. Marinelli (Baker & Botts, L.L.P.), Washington, DC, for Defendant–Intervenors.

## OPINION

POGUE, Judge:

This case is before the Court on a motion for judgment upon the agency record pursuant to USCIT R. 56.2. Plaintiff Gerald Metals, Inc. ("Gerald Metals") brings this action under section 516A of the Tariff Act of 1930 for review of the final affirmative determination of the United States International Trade Commission ("Commission") that less-than-fair-value ("LTFV") imports of pure magnesium from Ukraine are causing material injury to the domestic industry.[1] *Magnesium from China, Russia, and Ukraine,* 60 Fed. Reg. 26,456–57 (Int'l Trade Comm'n, May 17 1995) (final). The Commission's opinion is

---

1. Gerald Metals is a metals trading company which imports, among other products, pure magnesium from Russia and Ukraine into the United States.

set forth in *Magnesium from China, Russia, and Ukraine*, USITC Pub. 2885, Inv. Nos. 731–TA–696–698 (May 1995) ("Determination").[2] The Court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994) and affirms the Commission's finding of material injury.

## BACKGROUND

On March 31, 1994, Magnesium Corporation of America, International Union of Operating Engineers, Local 564, and United Steelworkers of America, Local 8319, filed an antidumping petition under section 773 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b (1988),[3] alleging material injury by reason of LTFV imports of pure and alloy magnesium from China, Russia, and Ukraine. In its preliminary determination, the Commission found reasonable indication of material injury to an industry in the United States because of imports of magnesium from the subject countries.[4] On June 22,

1994, The Dow Chemical Company ("Dow") joined the petitioners.

The United States Department of Commerce, International Trade Administration ("Commerce") issued preliminary determinations that imports of magnesium from the three subject countries were being sold at less than fair value within the meaning of section 733(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673b(b) (1988). The Commission then instituted its final investigations.[5] On March 30, 1995, Commerce published final determinations of LTFV sales for imports of magnesium from all three subject countries.[6]

On May 17, 1995, the Commission published its final determinations in its investigations of imports of pure and alloy magnesium.[7] The Commission determined that the domestic pure magnesium industry was materially injured by reason of LTFV imports of pure magnesium from China, Russia, and Ukraine.[8] Three commissioners, Chairman

**2.** List 1, Doc. 106; List 2, Doc. 42. List 1 consists of the documents within the public portion of the record made before the Commission. List 2 consists of the documents within the confidential portion of the same record.

**3.** The Uruguay Round Agreement Act ("URAA"), Pub.L. No. 103–465, tit. II, 108 Stat. 4809, 4842 (1994), amended the antidumping laws. These amendments, however, do not apply to investigations initiated before January 1, 1995, *id.* at § 291(a)(2), (b), which are thus regulated by the pre-existing law. Accordingly, this Court refers to the antidumping statute in effect prior to January 1, 1995. For simplicity, the Court speaks in the present tense when referring to the pre-existing statute.

**4.** *Magnesium From the People's Republic of China, Russia, and Ukraine*, 59 Fed.Reg. 27,297 (Int'l Trade Comm'n, May 26, 1994) (preliminary). However, in its preliminary determination the Commission excluded imports of alloy magnesium from Ukraine.

**5.** *Magnesium from the People's Republic of China, Russia, and Ukraine*, 59 Fed.Reg. 63,105 (Int'l Trade Comm'n, December 7 1994) (notice).

**6.** *Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium from Ukraine*, 60 Fed.Reg. 16,432 (March 30, 1995); *Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium and Alloy Magnesium From the People's Republic of China*, 60 Fed.Reg. 16,437 (March 30, 1995); *Notice of Final Determinations of Sales at Less Than Fair Value: Pure*

*Magnesium and Alloy Magnesium From the Russian Federation*, 60 Fed.Reg. 16,440 (March 30, 1995).

Commerce assigned margins ranging from 79.87 to 104.27 percent to subject imports from Ukraine, from zero to 100.25 percent to subject imports from Russia, and 108.26 percent to subject imports from China. Sales of Russian pure and alloy magnesium through Gerald Metals were assigned a LTFV margin of zero. 60 Fed. Reg. at 16,449–50.

**7.** *Magnesium from China, Russia, and Ukraine*, 60 Fed.Reg. 26,456–57 (Int'l Trade Comm'n, May 17, 1995) (final).

**8.** *Id.* at 18–22. Pure magnesium encompasses: (1) products that contain at least 99.95 percent primary magnesium, by weight (generally referred to as "ultra pure" magnesium); (2) products containing less than 99.95 percent but not less than 99.8 percent primary magnesium, by weight (generally referred to as "pure" magnesium); and (3) products (generally referred to as "off-specification pure" magnesium) that contain 50 percent or greater, but less than 99.8 percent primary magnesium, by weight, and that do not conform to ASTM specification for alloy magnesium. "Off-specification pure" magnesium is pure primary magnesium containing magnesium scrap, secondary magnesium, oxidized magnesium or impurities (whether or not intentionally added) that cause the primary magnesium content to fall below 99.8 percent by weight. It generally does not contain, individually or in combination, 1.5 percent or more, by weight, of

Watson, Vice Chairman Nuzum, and Commissioner Crawford dissented, and each filed dissenting views. The Commission also unanimously determined that the domestic alloy magnesium industry was not materially injured or threatened with material injury by reason of LTFV imports of alloy magnesium from China and Russia.[9]

This action presents the following issues:

1. Whether the Commission considered the existence of fairly-traded imports of pure magnesium from Russia, available to domestic consumers at prices comparable to those of LTFV imports, and whether the existence of such fairly-traded imports should have precluded a finding that dumped imports were a cause of injury to the domestic industry?

2. Whether the Commission properly determined that Dow closed one of its magnesium plants because of the subject imports?

3. (a) Whether the Commission properly decided to close the period of investigation in June 1994 when the subject imports decreased?

(b) Whether the tight supply conditions which occurred in the domestic market during 1994 and the first quarter of 1995 preclude a finding of present material injury to the domestic industry by reason of subject imports?

## STANDARD OF REVIEW

The Court will uphold a Commission determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law...." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *Matsushita Elec. Indus. Co., Ltd. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984). "The court is not empowered to substitute its judgment for that of the agency." *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *see also Matsushita,* 750 F.2d at 936. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted); *Matsushita,* 750 F.2d at 936.

## DISCUSSION

**1. *Did the Commission consider fairly-traded imports from Russia, and does their existence preclude a finding of material injury?***

Vice Chairman Nuzum, in her dissenting views, found that "a sizeable portion of the imports from Russia were fairly traded. These imports undersold domestic product almost as frequently as did LTFV imports."[10] Similarly, dissenting Commission-

the following alloying elements: aluminum, manganese, zinc, silicon, thorium, zirconium, and rare earths. *Id.* at 3 n. 3, and 6. Pure magnesium is provided for in subheading 8104.11.00 of the Harmonized Tariff Schedule of the United States ("HTSUS").

9. *Id.* at 23–26. Gerald Metals does not seek review of this determination.

Alloy magnesium contains 50 percent or greater, but less than 99.8 percent, primary magnesium, by weight, and one or more of the following: aluminum, manganese, zinc, silicon, thorium, zirconium, and rare earths, in amounts which, individually or in combination, constitute not less than 1.5 percent of the material, by weight. Products that meet the aforementioned description but do not conform to ASTM specifications for alloy magnesium are not included in the definition of alloy magnesium. In addition to primary magnesium, alloy magnesium may contain magnesium scrap, secondary magnesium, or oxidized magnesium in amounts less than the primary magnesium itself. *Id.* at 3 n. 4, and 6–7. Alloy magnesium is provided for in subheading 8104.19.00, HTSUS.

10. *Determination* at 35 (Vice Chairman Nuzum, dissenting views) (citing Table 24, CR at I–45, PR at I–26; Table 25 and 26, CR at I–57, I–60, PR at I–31–32) (List 1, Doc. 106).

er Crawford noted that "[d]umped Russian imports and fairly traded Russian imports are very close, if not perfect, substitutes." [11]

Plaintiff contends that the Commission did not consider fairly-traded imports of pure magnesium from Russia, nor their impact on the domestic market. Plaintiff avers that record evidence shows that such imports were no different from the dumped Russian imports in product quality, price, terms, and conditions of sale.[12] The only difference between fairly-traded Russian imports and LTFV Russian imports is that they are not traded by the same trading companies; some trading companies were assigned zero margins and others were assigned a margin of 100.25 percent.[13] Plaintiff argues that if LTFV Russian imports had been removed from the domestic market, then fairly-traded Russian imports would have expanded to fill the market share left by LTFV Russian imports. Consequently, plaintiff claims, even in the absence of LTFV imports, the injury to the domestic industry would have been the same.

Ⅰ The thrust of plaintiff's argument is that there is no causal nexus between LTFV imports from Ukraine and material injury to the domestic industry. LTFV imports from China, Ukraine and Russia were found to compete directly in the market, and to be close substitutes. Plaintiff maintains that, absent any LTFV imports, domestic consumers would have purchased fairly-traded Russian imports, which would have replaced LTFV imports from China and Ukraine in the same way they would have replaced LTFV Russian imports.[14] This demonstrates, according to plaintiff, that subject imports did not cause any material injury to the domestic industry.[15] Instead, plaintiff complains, the Commission erroneously concluded that domestic product would have replaced all the subject imports.[16]

Ⅰ Defendant preliminarily objects that this claim was not raised before the Commis-

---

11. *Determination* at 45 (Commissioner Crawford, dissenting views) (List 1, Doc. 106).

12. Reporting from Commissioner Crawford's dissenting view, *Determination* at 45 (List 1, Doc. 106).

13. Commerce assigned zero margins to pure magnesium imported through trading companies who submitted sufficient responses, and a margin of 100.25 percent to all other trading companies who did not respond, cooperate or have sales during the period of investigation. *Memorandum INV–S–055* (List 2, Doc. 36). *See also Determination* at 47 (Commissioner Crawford, dissenting views) (List 1, Doc. 106).

14. *Determination* at 20 (List 1, Doc. 106). "[T]here is no apparent reason why LTFV pure magnesium from China and Ukraine, if removed from the domestic market, would not also have been replaced with fairly-traded Russian magnesium." Plaintiff's Brief in Support of Rule 56.2 Motion at 23.

15. Even if the Russian fairly-traded imports would have replaced only the Russian LTFV imports, Gerald Metals argues that there would be no impact from subject imports because the volume of subject imports from China and Ukraine is not significant.

16. Plaintiff's argument follows the one-step analysis, which recreates what the industry would look like in the absence of the LTFV imports, and then compares that situation to the domestic

industry as it exists. This analysis isolates the effects of the subject imports from other factors which might be causing injury to the domestic industry. *See generally U.S. Steel v. United States*, 18 CIT 1190, 873 F.Supp. 673, 694–95 (1994), *appeal docketed*, No. 95–1245 (Fed.Cir. Feb. 24, 1995). The alternative two-step analysis starts with examining whether the industry is injured; if the answer is in the affirmative, the second step will examine whether the LTFV imports are a non-de minimis cause of that injury. *Id.*

Plaintiff does not claim that the one-step analysis *should* apply, but that consideration of the one-step analysis reveals a fundamental flaw in the Commission plurality's treatment of causation, i.e., the industry would have been the same had the LTFV imports not been present. (Plaintiff's Reply Brief at 6.) Defendant-intervenors claim that plaintiff's argument about the outcome of a one-step analysis is weakened by the *Final Economic Memorandum*, a part of the administrative record which utilized the one-step analysis, and reached the same causation conclusion as the final determination.

It is within the Commission's discretion to choose a reasonable causation analysis. *See Negev Phosphates, Ltd. v. United States Department of Commerce*, 12 CIT 1074, 1089, 699 F.Supp. 938, 951 (1988) (citing *Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 1050–51, 700 F.Supp. 538, 558 (1988)) ("[T]he Commission has discretion in its choice of reasonable analytical methodologies.").

sion, and that plaintiff is estopped from raising it.[17] However, the rule of exhaustion of administrative remedies is neither absolute nor inflexible, *see* 28 U.S.C. § 2637(d) (1994) (the court "shall, *where appropriate,* require the exhaustion of administrative remedies") (emphasis provided). Various exceptions have been articulated by this court. In this case, the Court will entertain the claim because the agency had an opportunity to consider the issue. *Holmes Products Corp. v. United States,* 16 CIT 1101, 1103–04, 1992 WL 394223 (1992). *See also Ceramica Regiomontana, S.A. v. United States,* 14 CIT 706, 708, 1990 WL 160253 (1990). The issue of the fairly-traded imports was discussed during the Commission's hearing,[18] and was also considered by the dissenting Commissioners.[19] Consequently, the rule of exhaustion of remedies does not apply here.

On the merits, the Commission correctly considered volume/price effects of LTFV imports, after the data reflecting fairly-priced imports had been separated from the data on LTFV imports.[20] The Commission found material injury by reason of LTFV imports.

▮▮▮▮ Record evidence supports the fact that the Commission did consider the fairly-traded imports. As noted above, the issue was discussed at the Commission's hearing. Upon request by some Commissioners, the Office of Investigations transmitted to the Commission a memorandum which explained the result of the investigation with regard to fairly-traded Russian imports.[21] Moreover, the Commission is presumed to have considered all relevant evidence on the administrative record.[22] The Commission considered the presence and effects of fairly-traded Russian imports; therefore, its determination is in accordance with law.[23]

17. Defendant cites *Ceramica Regiomontana S.A. v. United States,* 14 CIT 706, 708, 1990 WL 160253 (1990); *Cemex, S.A. v. United States,* 16 CIT 251, 258, 790 F.Supp. 290 (1992), *aff'd,* 989 F.2d 1202 (Fed.Cir.1993); *Wieland Werke, AG v. United States,* 13 CIT 561, 567, 718 F.Supp. 50, 55 (1989); *Holmes Products Corp. v. United States,* 16 CIT 1101, 1104, 1992 WL 394223 (1992); *Timken Co. v. United States,* 11 CIT 786, 789, 673 F.Supp. 495 (1987); *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed. Cir.1990); *PPG Industries, Inc. v. United States,* 14 CIT 522, 542, 746 F.Supp. 119 (1990).

18. *See Transcript of Proceedings* at 120–30 (List 1, Doc. 73).

19. *Determination* at 28–29 (dissenting views of Chairman Watson) (List 1, Doc. 106); *id.* at 35–36 (dissenting views of Vice Chairman Nuzum); *id.* at 42, 44–50 (dissenting views of Commissioner Crawford).

20. *Staff Report,* Tables 23 and 24 (List 2, Doc. 37 at I–46–49). *See Algoma Steel Corp. v. United States,* 12 CIT 518, 523, 688 F.Supp. 639, 645 (1988) (explaining that ITC must establish "what effect imports in a class of merchandise sold at LTFV have on the domestic industry producing the 'like' product"), *aff'd,* 865 F.2d 240, 242 (Fed.Cir.1989) (holding that once Commerce determines that a class or kind of goods was being sold at LTFV, the ITC is not required to pursue details and break down the LTFV sales from the MTFV ones, even though MTFV sales might be considered, in some particular cases, if relevant to the injury determination); *USX Corp. v. United States,* 12 CIT 205, 219, 682 F.Supp. 60, 73 (1988) (arguing that antidumping law "require[s] a causal link between unfairly traded imports and material injury to domestic industry;" how-

ever, the requirement that cumulated imports be unfairly traded does not mean that "all imports cumulated be causes of material injury if considered independently;" only LTFV imports "should be candidates for cumulation").

21. *Memorandum INV–S–055* (List 2, Doc. 36).

22. Lack of discussion of issues does not mean that the Commission failed to consider them. *Grupo Indus. Camesa v. United States,* 18 CIT 461, 853 F.Supp. 440, 445 (1994) (holding that ITC is not required to issue findings and conclusions simply because the party presented them), *aff'd,* 85 F.3d 1577 (Fed.Cir.1996); *Connecticut Steel Corp. v. United States,* 18 CIT 313, 852 F.Supp. 1061, 1065 (1994); *Granges Metallverken AB v. United States,* 13 CIT 471, 478, 716 F.Supp. 17, 24 (1989) (explaining that absence of discussion of an issue in the determination "does not establish that the Commission failed to consider that information because there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties.... The Commission is presumed to have considered all of the evidence in the record, especially where the facts allegedly ignored were presented at an open hearing").

23. At oral argument, Gerald Metals contended that, under *USX Corp. v. United States,* 11 CIT 82, 655 F.Supp. 487 (1987), an insufficient record amounts to a procedural error. The Court disagrees with plaintiff's interpretation of *USX.* That case was remanded because the Commission's determination was unsupported by substantial evidence, *id.* 655 F.Supp. at 491, 498. The Court does not need to reach the question raised by Gerald Metals because it concludes that the record is sufficient.

■ Plaintiff relies on the assumption that fairly-traded Russian imports would replace all or the greatest part of the subject imports. The record shows no evidence supporting this claim.[24] The Commission found that subject imports from different countries competed with each other and with like domestic products, and the Commission cumulatively assessed the volume and effect of those imports.[25] The Commission evaluated all relevant economic factors regarding the imports, and found that LTFV imports of pure magnesium from China and Ukraine were not negligible and had a discernable adverse impact on the domestic industry.[26] The investigations reported rapid and significant increase in the volume of LTFV imports, persistent underselling by the LTFV imports, decline in the domestic industry's production and sales, loss of the domestic industry's market share, and poor financial condition of the domestic industry during the period of investigation.[27] Substantial evidence on the record corroborates the Commission's determination that the domestic industry was materially injured by reason of the LTFV imports from Ukraine.

■ Contrary to plaintiff's representation, the Commission did not conclude that "all subject imports eliminated from the domestic market would have been replaced with domestic product."[28] Rather, the Commission established that "U.S. producers should have been able to raise their prices for pure magnesium without sacrificing a significant amount of sales volume."[29] Even though fairly-priced imports may have been *another* cause of injury, the Commission has a statutory obligation not to weigh causes.[30] Thus, it correctly did not compare the impact of subject imports to the impact of other factors, like the fairly-traded imports.

The foregoing discussion also answers plaintiff's argument that the imposition of antidumping duties in this case would not be remedial, but penal.[31] To the extent that antidumping duties afford a prospective relief to the domestic industry, which would otherwise be further injured by the LTFV imports, the Commission's determination is

---

24. Indeed, the LTFV imports at issue here are from Ukraine, whereas plaintiff's hypothetical centers on the Russian imports. Even in a perfectly competitive market, producers and consumers' decisions are driven not only by the quality and price of the product itself (which in this case is proven to be more or less the same in Ukraine and in Russia) but also by other considerations. For example, the Commission found in the purchasers' questionnaire responses that their decision from whom to purchase is influenced by various factors, like contract terms, service, warranties, sales techniques, delivery, credit terms, etc. *See Determination* at I–33 (List 1, Doc. 106); *Conf. Determination* at I–63 (List 2, Doc. 42). Plaintiff's argument assumes that a producer would automatically switch to different importers trading at fair value in the same way as domestic consumers would automatically switch to different trading companies in buying pure magnesium. Plaintiff's assumption is not persuasive, not only because it is not verified, but also because it is contradicted by the record.

25. *Determination* at 15–16 (List 1, Doc. 106). *See* 19 U.S.C. § 1677(7)(C)(iv) (1988).

26. *Id. See* 19 U.S.C. § 1677(7)(C)(v) (1988). *See also Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1018–19, 728 F.Supp. 730, 735 (1989) (concluding that "[t]he Commission has

broad discretion to ascertain which economic factors are relevant in an investigation, and the weight to be given those factors.").

27. *Determination* at 19–22 (List 1, Doc. 106).

28. Plaintiff's Brief at 23. At oral argument, plaintiff reiterated this assertion.

29. *Determination* at 22 (citing *Economic Memorandum* at 14–15) (List 1, Doc. 106).

30. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 57 (1979); H.R.Rep. No. 317, 96th Cong., 1st Sess. 46–47 (1979). *See also Encon Industries, Inc. v. United States,* 16 CIT 840, 841, 1992 WL 245899 (1992); *Citrosuco Paulista v. United States,* 12 CIT 1196, 1228, 704 F.Supp. 1075, 1101 (1988) (holding that the Commission may not weigh causes, and an affirmative injury determination is warranted if imports contribute even minimally); *Hercules Inc. v. United States,* 11 CIT 710, 742–43, 673 F.Supp. 454, 481–82 (1987) ("If the ITC finds material injury exists due to an even slight contribution from imports, the ITC may not weigh this contribution against the effects of other factors that are not used in the determination.").

31. *See* Plaintiff's Reply Brief at 8–9, reiterated at oral argument.

in accord with the remedial purpose of the statute.[32]

### 2. Is the Commission's determination that Dow closed one of its plants because of the subject imports supported by substantial evidence, and otherwise in accordance with law?

The Commission found that the domestic producers' market share declined from 1992 to 1993 while the volume and market share of the LTFV imports increased.[33] Domestic producers lowered their prices in order to maintain production volumes.[34] However, one producer, Dow, reconsidered its plan to restructure one of its plants, and instead decided to shut it down.[35]

Plaintiff claims that the Commission's determination should be reversed [36] or, alternatively, remanded [37] for further fact finding on the reasons for the Dow plant closure. Plaintiff contends that the Commission's conclusion that the LTFV imports were responsible for Dow's closure of the plant is not supported by substantial evidence on the record. Such conclusion, plaintiff argues, is only supported by statements offered by a witness at the hearing [38] and by petitioners in their posthearing brief,[39] to which Chairman Watson gave "little credence." [40]

Plaintiff claims that Dow's decision, instead, was based on long-term market considerations. Press releases issued by Dow at the time of the plant closing did not mention the subject imports as the cause of the closing. Moreover, plaintiff alleges that Dow never complied with the Commission's request to provide evidence [41] supporting the claim that Dow's decision to close plant B was caused by the impact of the subject imports.[42] Dow's failure to provide the requested additional evidence is, according to plaintiff, a sufficient basis for drawing an adverse inference against Dow.[43] In addition, the Commission could have reached a different determination based on the best information available ("BIA").[44] Plaintiff

---

**32.** *Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1103 (Fed.Cir.1990); *Chr. Bjelland Seafoods A/S (Now Norwegian Salmon A/S) v. United States,* slip op. 95–5 at 21, 1995 WL 25327 (Jan. 8, 1995) (*"Norwegian Salmon II "*).

**33.** *Determination* at 22 (List 1, Doc. 106).

**34.** *Id.* The Commission found that producers must keep the electrolytic cells used in the production of magnesium in constant operation. If the cells are not kept running constantly, they deteriorate and must be rebuilt, which is very expensive. *Id.* at 10–11.

**35.** *Id.* at 22.

**36.** Plaintiff cites *American Spring Wire Corp. v. United States,* 8 CIT 20, 590 F.Supp. 1273 (1984); *Norwegian Salmon II.*

**37.** Plaintiff cites *USX Corp. v. United States,* 12 CIT 205, 682 F.Supp. 60 (1988).

**38.** *Transcript of Proceedings* at 31–33 (List 1, Doc. 73).

**39.** Petitioners' Posthearing Brief, Appendix B at 28–29 (List 2, Doc. 29).

**40.** *Determination* at 30 (Views of Chairman Watson, dissenting) (List 1, Doc. 106). Plaintiff relies on *USX Corp. v. United States,* 11 CIT 82, 84, 655 F.Supp. 487, 489 (1987) ("ITC may not rely upon isolated tidbits of data which suggest a result contrary to the clear weight of the evidence.") and on *Metallverken Nederland B.V. v.*

*United States,* 13 CIT 1013, 1034, 728 F.Supp. 730, 746 (1989) ("The testimony of a witness is not dispositive," adding, however, that "[t]he Commission has authority to weigh all evidence relevant to intent and to reject the testimony of representatives of interested parties when warranted.") (citing *American Permac, Inc. v. United States,* 10 CIT 719, 724, 656 F.Supp. 1228, 1233 (1986), *aff'd,* 831 F.2d 269 (Fed.Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988)).

**41.** *Transcript of Proceedings* at 220 (List 1, Doc. 73) (reported at 236 in plaintiff's copy, Doc. 5, Public Appendix to Plaintiff's Brief).

**42.** *Id.* at 31–32 (List 1, Doc. 73).

**43.** Plaintiff relies on *Alberta Pork Producers' Marketing Board v. United States,* 11 CIT 563, 580, 669 F.Supp. 445, 459 (1987) (citations omitted). This case, however, discussed ITC's discretion to draw an adverse inference with respect to injury based upon a party's *failure to participate in the administrative proceedings. See Chung Ling Co., Ltd. v. United States,* 16 CIT 636, 638–39, 805 F.Supp. 45, 48 (1992).

**44.** *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560–61 (Fed.Cir.1984). "[T]he absence of information necessary for a thorough analysis may render a determination unsupported by substantial evidence." *USX Corp. v. United States,* 11 CIT 82, 95, 655 F.Supp. 487, 498 (1987) (reaffirming that the ITC must collect all accessi-

concludes that the Commission thus erred in finding that the plant shutdown supported a material injury determination.[45] The Court finds these arguments unpersuasive.

 Factual findings based on the analysis of the volume and impact of the subject imports support the Commission's conclusion regarding Dow's shutdown. The Commission found that "[o]ne producer, Dow Chemical, reacted to the loss in market share to the LTFV imports, *among other factors*, by shutting down one of its plants...." [46] Thus, the Commission's finding does not rest only on the testimony of Dow's manager.[47] Even the authorities cited by the plaintiff [48] recognize that the Commission has discretion to accept or reject testimony. Although different conclusions could be drawn about the causation of Dow's shutdown, the possibility of reaching two inconsistent conclusions from the same evidence does not prevent the Commission's finding from being supported by substantial evidence. *Consolo*, 383 U.S. at 620, 86 S.Ct. at 1026; *Grupo Indus. Camesa*, 85 F.3d 1577, 1580 (Fed.Cir.1996); *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 814 (1992); *Matsushita*, 750 F.2d at 933. Moreover, in its posthearing brief, Dow furnished an explanation of the reasons for the shutdown.[49] Dow also produced an internal memorandum reporting the reason for canceling the plant B project.[50] Accordingly, an adverse inference cannot be taken against Dow, because Dow did provide supporting evidence, and because the rule applies "only 'when a party has relevant evidence in his control which he fails to produce.'" *Atlantic Sugar, Ltd. v. United States*, 4 CIT 248, 251, 553 F.Supp. 1055, 1059 (1982) (citing *International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329, 1336 (D.C.Cir.1972)).[51]

 "The question is not whether the Commission might have obtained additional information, but whether its determinations are supported by substantial evidence and

---

ble information necessary for its analysis of the economic factors).

**45.** *Determination* at 22 (List 1, Doc. 106). Plaintiff claims that Dow could not distinguish between fairly-traded Russian imports and LTFV imports at the time it decided to close the plant, and its account of the reasons that led to that decision is therefore flawed. (Plaintiff's Reply Brief at 11.)

**46.** *Determination* at 22 (List 1, Doc. 106) (emphasis provided). Import volume and pricing data corroborate Dow's assertions that the subject imports were gaining market share. Moreover, as defendant-intervenors correctly point out, other factors may well have influenced Dow's decision. Nevertheless, the prerequisite of causation is satisfied if the "imports contribute, even minimally, to the conditions of the domestic industry, and the Commission is precluded from weighing causes." *Grupo Indus. Camesa v. United States*, 18 CIT 461, 853 F.Supp. 440, 444 (1994) (citing *British Steel Corp. v. United States*, 8 CIT 86, 96, 593 F.Supp. 405, 413 (1984)), *aff'd*, 85 F.3d 1577 (Fed.Cir.1996).

**47.** In any case, it is for the ITC to assess the credibility of witnesses. *Negev Phosphates, Ltd. v. United States Department of Commerce*, 12 CIT 1074, 1092, 699 F.Supp. 938, 953 (1988). *See also Chung Ling Co. v. United States*, 16 CIT 636, 648, 805 F.Supp. 45, 55 (1992) (holding that it is for the Commission to decide factual issues).

As consistently held by the Court of Appeals for the Federal Circuit, even if the administrative record contains evidence which detracts from

the evidence relied upon by the Commission, it is not for the court to decide whether it would have reached the same decision reached by the Commission. The role of the court is limited to a narrow standard of review. *Matsushita*, 750 F.2d at 936. *See also Consolo*, 383 U.S. at 620, 86 S.Ct. at 1026; *Grupo Indus. Camesa*, 85 F.3d at 1582.

**48.** *Metallverken Nederland*, 13 CIT 1013, 728 F.Supp. 730 (1989); *American Permac*, 10 CIT 719, 656 F.Supp. 1228 (1986), *aff'd*, 831 F.2d 269 (Fed.Cir.1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988).

**49.** Dow's Post–Hearing Brief at 31–32 (response to Question 7), (List 2, Doc. 29). Defendant-intervenors note that the evidence supports the conclusion that it was the anticipated *long-term presence* of imports that forced Dow to shut down plant B. *Transcript of Proceedings* at 31–32 (List 1, Doc. 73, App. 5). It would not have been rational to shut down the plant in the presence of a short-term occurrence, because restarting a closed production plant is very expensive, and cells must be kept in constant operation. *Determination* at 10–11 (List 1, Doc. 106, App. 2).

**50.** Dow's Post–Hearing Brief (List 2, Doc. 29, Exhibit 3).

**51.** *Chung Ling*, 16 CIT 636, 805 F.Supp. 45, the case cited by plaintiff, dealt with domestic producers' noncooperation in responding to Commission questionnaires.

are in accordance with law." *Stalexport and Huta Czestochowa v. United States*, 19 CIT ——, 890 F.Supp. 1053, 1076 (1995) (citations omitted). Other factors were accounted for in the Commission's determination.[52] The Commission determined that subject imports had depressed prices, or prevented price increases, and had caused lost sales/revenues.[53] The resultant significant adverse impact on the domestic industry caused Dow to react by closing its plant B.[54]

The Court concludes that the record, viewed as a whole, contains substantial evidence supporting the Commission's determination that Dow's decision to close its plant B was caused by the subject imports, among other factors, and that Dow's closing was only one of the many indicia of adverse impact on the domestic industry.

3. *Is the Commission's determination of present material injury supported by substantial evidence, and otherwise in accordance with law?*

The Commission made a positive injury determination regarding the Ukrainian imports of pure magnesium at issue. Plaintiff avers that there is no *present* injury because the subject imports decreased after June 1994, while the Commission did not reach its determination until April 1995.

In an antidumping investigation, the Commission determines whether an industry in the United States is materially injured, or is threatened with material injury, by reason of imports which Commerce has determined to be sold at LTFV. 19 U.S.C. § 1673d(b)(1) (1988). The statute defines material injury as a "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C.

§ 1677(7)(A) (1988). Among the relevant economic factors for the Commission to consider are the volume of the subject imports, their effect on prices of that merchandise or like products, and their impact on domestic producers of like products. 19 U.S.C. § 1677(7)(B).

The volume and the value of LTFV imports increased from 1992 through the first half of 1994.[55] Then, the LTFV imports virtually stopped.[56] Plaintiff contends that there could not be *present* injury because of such decrease in imports. The Commission, however, attributed the virtual cessation of LTFV imports after June 1994 to its preliminary affirmative determination in May 1994.[57]

Plaintiff avers that the decision to close the period of investigation on June 1994 was error. Plaintiff argues that the substantial decrease in imports during 1994 was caused by the liquidation of the Soviet military stockpile of magnesium, by Ukrainian power shortages, by a decision of the Ukrainian government to allocate more magnesium production for domestic consumption, and by more attractive selling terms in other parts of the world. Another cause was the loss of duty-free treatment effective July 1, 1994,[58] which resulted in the imposition of the regular duty rate of 8.00 percent *ad valorem.*

Plaintiff indicates that even though fairly-traded imports were not subject to antidumping duties they also declined during 1994, and their volume followed a pattern similar to that of LTFV imports. Plaintiff asserts that all these economic data should rebut the presumption that the decrease in LTFV imports was caused by the imposition of anti-

---

**52.** *Determination* at 22, *Conf. Determination* at 36 (List 1, Doc. 106; List 2, Doc. 42).

**53.** *Determination* at 20–21 (List 1, Doc. 106).

**54.** *Determination* at 22 (List 1, Doc. 106).

**55.** *Determination* at 19, and references to tables ibidem (List 1, Doc. 106); Memorandum INV–S–056 (April 26, 1995) (List 1, Doc. 102).

**56.** *Determination* at Table 24, I–24 (List 1, Doc. 106), *Conf. Determination* at I–46 (List 2, Doc. 42); Memorandum INV–S–056 (List 1, Doc. 102)

(attaching additional information as requested by Commissioner Bragg: 1994 monthly imports, by country, in metric tons, for pure magnesium; the imports from Ukraine stopped in May, the imports from China and Russia stopped in June; Chinese imports were reported again, in regular quantities, in September and October).

**57.** *Determination* at 19 n. 119 (citing *Metallverken Nederland*, 744 F.Supp. at 284 (CIT 1990)) (List 1, Doc. 106).

**58.** *Notice that Certain Imports from Russia Have Exceeded the GSP Competitive Need Limits*, 59 Fed.Reg. 15,247 (U.S.Trade Rep.1994).

dumping duties.[59] Finally, plaintiff claims that no record evidence supports the presumption that imports stopped due to the investigations, nor has the Commission provided an explanation for its presumption.[60] Consequently, plaintiff contends that the required determination of *present* material injury was erroneous.

Maintaining that the material injury must exist "at the time of the Commission's final determination," *Norwegian Salmon I*, 16 CIT at 954,[61] plaintiff argues that the determination is wrong because it looked at allegations of lost sales or lost revenues which mostly occurred in 1993, a long time before the Commission reached its decision at the meeting held on April 26, 1995. The major volume increases and price declines occurred when the subject imports consisted mostly of magnesium from the Soviet stockpile. This evidence, according to plaintiff, points to past and not present injury.[62] In addition, plaintiff argues that the supply shortages which occurred as soon as subject imports stopped indicate that the domestic industry was unable to meet domestic demand.[63] Evidence of such supply shortages limits the probability of material injury by reason of LTFV imports.

This court has held that the Commission has discretion to choose "the most appropriate period of time for its investigation." *Saarstahl AG v. United States*, 18 CIT 595, 858 F.Supp. 196, 200 (1994) (interpreting *Norwegian Salmon I*, and citing *Kenda Rubber Indus. Co. v. United States*, 10 CIT 120, 126–27, 630 F.Supp. 354, 359 (1986)).[64] The magnesium imports at issue here ceased immediately after the Commission's preliminary determination in May 1994.[65] These circumstances induced the Commission not to rely on import data fol-

59. *Chr. Bjelland Seafoods A/C v. United States*, 16 CIT 945, 1992 WL 317538 (1992) ("*Norwegian Salmon I*").

60. *Norwegian Salmon I*, 16 CIT at 952 (1992) ("The Commission fails to explain, as it must, its conclusion that the decrease in the volume of imports ... cannot be the result of....") (citing *Bowman Transportation v. Arkansas–Best Freight System*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) and *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)).

*Bowman Transportation*, one of the cases relied upon in *Norwegian Salmon I*, applied the "arbitrary and capricious" standard. The Supreme Court indicated that "[t]he agency must articulate a 'rational connection between the facts found and the choice made.'" *Bowman Transportation*, 419 U.S. at 285, 95 S.Ct. at 441 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). The Court concluded, however, that "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 286, 95 S.Ct. at 442 (citing *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945)).

61. *See also Chr. Bjelland Seafoods A/S (Now Norwegian Salmon A/S) v. United States*, slip op. 95–5 at 21, 1995 WL 25327 (Court Int'l Trade Jan. 8, 1995). The court declared that the information collected within the time frame established by the ITC for its investigation represents a reference for an analysis of the condition of the domestic industry. The present material injury determination is "as recent to vote day as possible, given the limitations of the collected data." *Id.*

62. Plaintiff cites *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103 (Fed.Cir.1990). *Chaparral Steel* underscored that the remedial, rather than punitive, compensatory, or retaliatory nature of *antidumping* duties, indicates that subject imports can only be considered for their *present* injury to the domestic industry. *Id.* at 1103 (citing S.Rep. No. 249, 96th Cong., 1st Sess. 87, *reprinted in* 1979 U.S.C.C.A.N. 381, 473). A different reading would be inconsistent with the General Agreement on Tariffs and Trade. *Id.*, n. 5. The court added that "[e]ven when the Commission makes a determination of 'threat of material injury' it assesses the 'threat of the specific indicia of *present* material injury.'" *Id.* at 1104 (citing *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 52, 592 F.Supp. 1318, 1322 (1984) (emphasis in original)).

63. Gerald Metals acknowledges that Dow's shutdown and the consequent decrease in domestic capacity caused the supply shortages that occurred in 1994 and early 1995. (Plaintiff's Memorandum at 25.)

64. *Saarstahl* explained *Norwegian Salmon I* as advocating the use of information as contemporaneous as possible, without overlooking, however, the existence of latent effects of a present injury. *Id.* 858 F.Supp. at 200.

65. This pattern supports the presumption that the imports ceased because of the preliminary determination, and immediately prior to the first date on which retroactive duties could have been assessed. (Magnesium's Brief at 19.) *See* 19 U.S.C. § 1673b(a) (1988).

lowing its preliminary determination.[66] This treatment is consistent with the Commission's past practice, and with this court's decisions.[67]

The Court recognizes that the Commission also considered most of the arguments which pointed to causes other than the initiation of antidumping investigations. The Commission found that prices in Europe were not higher than prices in the United States.[68] The Commission also found that magnesium from the Soviet stockpile was imported "over most of the period of investigation and hardly constitute[d] a one-time or short-lived occurrence." [69] The investigation showed no relation between the depletion of the Soviet stockpile and the decline in imports. In any case, during the time when stockpile magnesium was imported, newly-produced Ukrainian and Russian pure magnesium was also being imported.[70]

The Court also finds unpersuasive plaintiff's argument that the change in tariff treatment caused the decline in imports. Russian imports began in the third quarter of 1992.[71]

Russia did not receive Generalized System of Preferences ("GSP") status until September 30, 1993.[72] Consequently, GSP benefits had no effect on the volume of imports. Moreover, Ukraine did not benefit from GSP status. Thus, Russia's loss of GSP status cannot · explain the cessation of imports from Ukraine at the same time.

Plaintiff's last argument that fairly-traded Russian imports stopped at the same time LTFV imports stopped is also unpersuasive. At the time Commerce initiated its investigations in March 1994, it did not distinguish fairly-traded imports from LTFV imports.[73] Such distinction was reached in March 1995 with Commerce's final determination. Therefore, when the imports stopped in June 1994, all imports were potentially subject to suspension of liquidation because potentially subject to a final affirmative determination.

■■■ The defendant Commission admits that its decision did not address every possible argument, e.g., the Ukrainian power shortage, or the change in Ukrainian govern-

---

66. *Determination* at 19, n. 119 (List 1, Doc. 106); *Conf. Determination* at 30, n. 155 (List 2, Doc. 42).

67. *Kern–Liebers USA, Inc. v. United States,* 19 CIT ——, slip op. 95–9 at 35, 1995 WL 33066 (Jan. 27, 1995), *appeals docketed sub nom. U.S. Steel v. United States,* Nos. 95–1257, -1306, -1307 (Fed.Cir. Mar. 28, 1995) (holding that the Commission may not rely on data collected after the initiation of the investigations); *Saarstahl,* 858 F.Supp. at 200 (explaining that Commission reasonably found that improvements in the condition of the domestic industry resulted from preliminary investigations); *Metallverken Nederland B.V. v. United States,* 14 CIT 481, 484, 744 F.Supp. 281, 284 (1990) (holding that data may be distorted by the initiation of investigation, which can create an artificially low demand for the affected imports). *See also U.S. Steel Group v. United States,* 18 CIT 1190, 873 F.Supp. 673, 700 (1994), *appeal docketed,* No. 95–1245 (Fed. Cir. Feb. 24, 1995) ("The court has not in the past required that the Commission rely upon interim data, due to concerns as to reliability.").

68. *Determination* at 19, n. 119 (List 1, Doc. 106); *Conf. Determination* at 30, n. 115 (List 2, Doc. 42) (citing Memorandum INV–S–055, List 1, Doc. 95; List 2, Doc. 36).

69. *Determination* at 20 (List 1, Doc. 106), *Conf. Determination* at 32 (List 2, Doc. 42). Plaintiff's testimony at the hearing indicated that the stockpiles were depleted at the end of 1993. *Tran-*

*script of Proceedings* at 192 (List 1, Doc. 73). Defendant-intervenors contend that, if there was any relation between the depletion of the Soviet stockpile and the subject imports, the halt in imports should have occurred in late 1993. (Magnesium's Brief at 20.)

70. *Determination* at 15–16 (List 1, Doc. 106), *Conf. Determination* at 24 (List 2, Doc. 42). *Transcript of Proceedings* at 192–93 (List 1, Doc. 73).

71. *Transcript of Proceedings* at 43 (testimony of Dr. Kenneth R. Button). Indeed, the Russian Federation received most favored nation ("MFN") treatment effective June 17, 1992 (57 Fed.Reg. 27,840) (June 22, 1992). Ukraine received MFN treatment effective June 23, 1992 (57 Fed.Reg. 28,771) (June 26, 1992).

72. *Proclamation No. 6599: To Amend The Generalized System of Preferences,* 58 Fed.Reg. 51,561 (October 1, 1993) (attached as Exhibit 7 to Petitioners' Posthearing Brief, in List 2, Doc. 29).

73. In initiating its investigations, Commerce announced proposed dumping margins of 40.15% and higher for pure magnesium from the subject countries. *Initiation of Antidumping Duty Investigations: Pure and Alloy Magnesium from the People's Republic of China, the Russia Federation, and Ukraine,* 59 Fed.Reg. 21,748–50 (April 26, 1994).

ment policies.[74] The Commission, however, is presumed to have considered all evidence, *Granges Metallverken,* 13 CIT at 479, 716 F.Supp. at 24, and does not have to respond to each piece of evidence presented by the parties, *id.* at 478–79, 716 F.Supp. at 24 (citing *Nat'l Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771, 780, 696 F.Supp. 642, 648–49 (1988); *Empire Plow Co. v. United States,* 11 CIT 847, 854, 675 F.Supp. 1348, 1354 (1987); *British Steel Corp. v. United States,* 8 CIT 86, 98, 593 F.Supp. 405, 415 (1984)). *See also Mitsubishi Materials Corp. v. United States,* 17 CIT 301, 312, 820 F.Supp. 608, 619 (1993) ("[T]he Commission is not required to discuss all information upon which it relied in making its determination. . . ."); *Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 1083, 699 F.Supp. 938 (1988).

Finally, as defendant notes, the statute does not require that injury be caused by imports entered at the time of the Commission's determination.[75] Plaintiff's argument about the exclusion of any present injury because of the 1994 domestic supply shortages is flawed, because it confuses the cause with the effect. Such shortages were caused by a decrease in domestic capacity which, in turn, was caused by the subject imports. Tight supply conditions were the results of the injury to the domestic industry, including loss of productive capacity.[76] Moreover, the effects of LTFV imports may be latent. *Saarstahl,* 858 F.Supp. at 200; *Kern–Lie-*

*bers,* slip op. 95–9 at 34–35; *Norwegian Salmon II,* slip op. 95–5 at 32.

The Commission considered the impact of the subject imports on the domestic industry.[77] The legislative history recognizes that adverse effects may become manifest over a long term.[78] The Commission found that this is especially true in the case of the magnesium industry, where injury may be experienced over a long term because of the nature of magnesium operations and the high cost of rehabilitating electrolytic cells once they have been shut down.[79] Consequently, the Commission's affirmative determination of present material injury is supported by substantial evidence on the administrative record, and otherwise in accordance with law.

## Conclusion

The Commission's affirmative determination of material injury is supported by substantial evidence on the administrative record, and otherwise in accordance with law. Accordingly, plaintiff's motion for judgment upon the agency record is denied and this action is dismissed.

## Judgment

This case having been submitted for decision and the Court, after due deliberation, having rendered a decision herein; in conformity with said decision, it is hereby

**ORDERED** that plaintiff's motion for judgment upon the agency record is denied in all respects; and it is further

**74.** Defendant-intervenors contend that the power problem at a production plant in Ukraine, which plaintiff's testimony reported as occurring in late February until the beginning of April, does not explain the halt in Russian imports. (Magnesium's Brief at 21.)

**75.** Defendant notes that in the case cited by plaintiff, *Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1104 (Fed.Cir.1990), the court recognized that subject imports could have a "continuing impact as of vote day." *Id.*

**76.** Defendant-intervenors submit that the volume of domestic production relative to domestic demand is not the sole measure of injury. The Commission is not required to consider the industry's ability to meet domestic demand. 19 U.S.C. § 1677(7). Rather, it must consider the volume of subject imports and any increase relative to domestic production or consumption. 19

U.S.C. § 1677(7)(B), (C)(i). Then, it must consider if underselling exists, and whether imports otherwise suppress and depress prices. 19 U.S.C. § 1677(7)(C)(ii). The Commission must also consider all other relevant economic factors. 19 U.S.C. § 1677(7)(C)(iii).

**77.** 19 U.S.C. § 1677(7)(C)(iii)(III), (IV) (1988). Factors to consider include output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, research and development. All factors are to be considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.*

**78.** S.Rep. No. 71, 100th Cong., 1st Sess. 117 (1987).

**79.** *Determination* at 10–11, 22 (List 1, Doc. 106).

**ORDERED** that the International Trade Commission's final determination of material injury in *Magnesium from China, Russia, and Ukraine,* USITC Pub. 2885, Inv. Nos. 731–TA–696–698 (May 1995) is sustained; and it is further

**ORDERED** that this action is dismissed.