GERALD METALS, INC., Plaintiff,

v.

UNITED STATES, Defendant,

and

Magnesium Corp. Of America, Int'l Union of Operating Engineers, Local 564, and United Steel Workers of America, Local 8319, Defendant–Intervenors.

Slip Op. 98–148.
Court No. 95–06–00782.

United States Court of International Trade.

Oct. 20, 1998.

Holland & Knight LLP (Frederick P. Waite and Kimberly R. Young ) and Joseph Brooks for Plaintiff.

Lyn M. Schlitt General Counsel; James A. Toupin, Deputy General Counsel; Andrea C. Casson, Michael Diehl, and Willis S. Martyn III, Office of the General Counsel, U.S. International Trade Commission, for Defendant.

Baker & Botts, L.L.P. (William D. Kramer and Clifford E. Stevens, Jr.) for Defendant–Intervenor.

## OPINION

POGUE, Judge:

On April 28, 1998, the Court remanded this matter to the International Trade Commission ("Commission"). *See Gerald Metals, Inc. v. United States Int'l Trade Comm'n,* 8 F.Supp.2d 861 (CIT 1998). The remand was ordered pursuant to the decision (December 23, 1997) of the Court of Appeals for the Federal Circuit ("Federal Circuit") directing this Court to vacate its decision to affirm the Commission's finding of material injury. *See Gerald Metals, Inc. v. United States,* 132 F.3d 716 (Fed.Cir.1997). In particular, this Court ordered the Commission to reconsider its material injury finding in a way that is consistent with the legal standard articulated by the Federal Circuit and takes into account the existence and substitutability of fairly-traded Russian imports of pure magnesium and the increase in the market share of these imports during the period of investigation. *Gerald Metals,* 8 F.Supp.2d at 862.

## BACKGROUND

Plaintiff Gerald Metals, Inc. ("Gerald Metals") commenced this action under section 516A of the Tariff Act of 1930 for review of the final affirmative determination of the Commission that less-than-fair-value ("LTFV") imports of pure magnesium from Ukraine are causing material injury to the domestic industry. *Magnesium from China, Russia, and Ukraine,* 60 Fed.Reg. 26,456–57 (Int'l Trade Comm'n, May 17, 1995)(final).[1] The Court exercised jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994).

Gerald Metals argued that there was no causal nexus between LTFV imports from Ukraine and material injury to the domestic industry. *See Gerald Metals, Inc. v. United States,* 20 CIT ——, 937 F.Supp. 930, 934 (1996), *vacated,* 132 F.3d 716 (Fed.Cir.1997). Gerald Metals contended "that, absent any LTFV imports, domestic consumers would have purchased fairly-traded Russian imports," demonstrating that the LTFV imports did not cause any material injury to the domestic industry. *Id.*

The circumstances surrounding the existence of fairly-traded Russian imports of pure magnesium were indeed unique. Only two producers were responsible for all Russian imports of pure magnesium. *See Gerald Metals,* 132 F.3d at 720. Whether the Russian imports arrived as fairly-traded or LTFV was determined solely by which trading company exported the product.[2] *Id.* Therefore, the fairly-traded and LTFV Russian imports of pure magnesium were found to be perfect substitutes for each other. *Id.*

**1.** The Commission's investigation commenced when, on March 31, 1994, Magnesium Corporation of America, International Union of Operating Engineers, Local 564, and United Steelworkers of America, Local 8319 ("Defendant–Intervenors") filed an antidumping petition under section 732 of the Tariff Act of 1930, *as amended,* 19 U.S.C. § 1673a (1988), alleging material injury by reason of LTFV imports of pure magnesium from China, Russia, and Ukraine. The Commission cumulated the effects of LTFV pure magnesium imports from Russia, China, and Ukraine pursuant to 19 U.S.C. § 1677(7)(C)(iv)(1988).

The Uruguay Round Agreement Act, Pub.L. No. 103–465, tit. II, 108 Stat. 4809, 4842 (1994), amended the antidumping laws. These amendments, however, do not apply to investigations initiated before January 1, 1995, *id.* at

§ 291(a)(2),(b), which are thus regulated by the pre-existing law. Accordingly, this Court refers to the antidumping statute in effect prior to January 1, 1995. For simplicity, the Court speaks in the present tense when referring to the pre-existing statute.

**2.** Unlike the situation in *Algoma Steel Corp., Ltd. v. United States,* 12 CIT 518, 688 F.Supp. 639 (1988), *aff'd,* 7 Fed. Cir. (T) 154, 865 F.2d 240 (1989), this case does not involve the situation where individual sales within the *class* of merchandise determined by Commerce to be sold at LTFV were fairly traded. Rather, pricing by different trading companies, which Commerce assigned dumping margins of either zero percent or 100.25%, determined whether the pure magnesium arrived as fairly-traded or LTFV.

In addition, the record indicated that the Commission found both classes of Russian imports to be close substitutes with the LTFV Chinese imports and the LTFV Ukrainian imports. *Id.* at 721.

Nevertheless, this Court affirmed the Commission's finding of material injury by reason of LTFV imports from Ukraine. *See Gerald Metals*, 20 CIT at ——, 937 F.Supp. at 942. Although the Commission's final determination did not account for the existence of fairly-traded Russian imports, *see Magnesium from China, Russia, and Ukraine*, USITC Pub. 2885, Inv. Nos. 731–TA–696–698 (May 1995)(Views of the Commission)("Determination") [3], the Court found that record evidence indicated that the Commission did consider them. *See Gerald Metals*, 20 CIT at ——, 937 F.Supp. at 935. Because "[t]he Commission considered the presence and effects of fairly-traded Russian imports[,]" the Court concluded, "its determination [was] in accordance with the law." *Id.* The Court then found substantial evidence to support the Commission's determination that the domestic industry was materially injured by reason of the LTFV Ukrainian imports. *Id.* at ——, 937 F.Supp. at 936.

The Federal Circuit disagreed. On appeal by Gerald Metals, the Federal Circuit concluded that, "[g]iven the unique circumstances of this case [i.e., the presence and substitutability of fairly-traded Russian imports], the record, without more, does not show that LTFV imports were the reason for the harmful effects to the domestic magnesium industry." *Gerald Metals*, 132 F.3d at 722–23. The Federal Circuit held that this Court "erred by applying an incorrect legal test for the amount of contribution to material harm by LTFV goods necessary to satisfy

the 'by reason of' standard." [4] *Id.* at 722. The Federal Circuit held that, by failing to adequately account for the presence and substitutability of fairly-traded Russian imports, this Court "followed the reasoning that *any* contribution [by LTFV imports] constitutes sufficient causation to satisfy the 'by reason of' test." *Id.* The Federal Circuit clarified that "evidence of de minimis (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute." *Id.*

Thus, on April 28, 1998, this Court ordered the Commission,

> to reconsider its material injury finding in away that is consistent with the legal standard articulated by the [Federal Circuit] and that takes into account the existence and substitutability of fairly-traded Russian imports of pure magnesium and the increase in the market share of said imports during the period of investigation[.]

*Gerald Metals*, 8 F.Supp.2d at 862. On remand, the Commission determined by a two to one majority that an industry in the United States was not materially injured or threatened with material injury by reason of imports of pure magnesium. *See Magnesium from the People's Republic of China, Russia, and Ukraine*, Inv. Nos. 731–TA–696–698 (June 30, 1998)(Final, Remand)("Remand").[5] Upon review of the Commission's remand determination, this Court is presented with the following issues:

1) Whether the Commission reconsidered its material injury finding in a way that is consistent with the legal standard articulated by the Federal Circuit; and

---

**3.** List 1, Doc. 106; List 2, Doc. 42. List 1 consists of the documents within the public portion of the record made before the Commission. List 2 consists of the documents within the confidential portion of the same record.

**4.** Section 735 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1673d(b) (1988) provides:

The Commission shall make a final determination of whether—
(A) an industry in the United States—
(i) is materially injured, or
(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a)(1) of this section.

**5.** List 1R, Doc. 132; List 2R, Doc. 56. Remand Record List 1R consists of the documents within the public portion of the record made before the Commission in this remand action. List 2R consists of the documents within the confidential portion of the same record.

2) Whether the Commission's remand determination that an industry in the United States was not materially injured by reason of imports of pure magnesium from Ukraine is supported by substantial evidence and otherwise in accordance with law.[6]

## MATERIAL INJURY BY REASON OF LTFV IMPORTS

■ An affirmative injury determination by the Commission "requires both (1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." *Gerald Metals*, 132 F.3d at 719 (citing 19 U.S.C. § 1673d(b); *see supra* note 4).

■ According to the Federal Circuit, the "by reason of" standard "mandates a causal—not merely temporal—connection between the LTFV goods and the material injury." *Gerald Metals*, 132 F.3d at 720. The standard "requires adequate evidence to show that the harm occurred 'by reason of' the LTFV imports, not by reason of a minimal or tangential contribution to the material harm...." *Id.* at 722.

■ In examining the causal connection between the LTFV imports and the material injury (i.e., whether material injury occurred *by reason of* the LTFV imports), the Commission is required by statute to consider three factors: "1) the volume of [LTFV] imports, 2) the effect of [LTFV] imports on prices of like domestic products, and 3) the impact of [LTFV] imports on domestic producers of like products." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F.Supp. 487, 489 (1987)(citing 19 U.S.C. § 1677(7)(B)). The Commission evaluates the causal effects of the three factors on the harm to the domestic industry by applying the standards set forth in 19 U.S.C. § 1677(7)(C). *See U.S. Steel Group v. United States*, 96 F.3d 1352, 1360–61 (Fed.Cir.1996); *Trent Tube Div. v. Avesta Sandvik Tube*, 975 F.2d 807, 814 (1992). The relevant portions state:

(i) Volume

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that vol-

**6.** Defendant–Intervenors have filed a motion to stay the proceedings in this case pending a final decision in an appeal before the Federal Circuit in *Magnesium Corp. of Am. v. United States*, No. 97–1255 (Fed.Cir.)(the "Commerce Appeal"). *See* Mem. Supp. Def.-Intervenors' Mot. For Stay at 1–2. In the Commerce Appeal, Defendant–Intervenors have challenged Commerce's determination that Russian fairly-traded imports existed. *See id.* at 1. Defendant–Intervenors argue that a reversal by the Federal Circuit of the Commerce Appeal and a subsequent remand to Commerce "could result in a reversal of Commerce's original determination ... that imports from Russia were sold at fair value." *Id.* at 2. Defendant–Intervenors argue that, because the Commission's remand determination was predicated upon the existence of fairly-traded Russian imports, a reversal of Commerce's original determination "would eliminate the basis for the Commission's finding of no injury in its Remand Determination in this case." *Id.*

More specifically, Defendant–Intervenors argue that a decision by this Court to stay the current proceeding pending a final decision in the Commerce Appeal would: 1) promote the statutory goal of accurate antidumping decision-making; 2) "prevent the irreparable injury to Defendant–Intervenors that would result from loss of the right to effective review of the Commission's Remand Determination[;]" and 3) avoid the possibility that this Court may issue an

opinion that is inconsistent with the Federal Circuit's decision in the Commerce Appeal. *Id.*

Stays pending appeal are an extraordinary and disfavored remedy. *See Philipp Brothers, Inc. v. United States*, 10 CIT 448, 453, 640 F.Supp. 261, 265 (1986). Defendant–Intervenors' first and third arguments are not persuasive because this Court "cannot assume anything about what will happen on appeal, and for the lower court to refrain from acting [based] on any suppositions about future events would be both presumptuous and improper." *American Grape Growers Alliance for Fair Trade v. United States*, 9 CIT 568, 569, 622 F.Supp. 295, 296 (1985). Defendant–Intervenors' second argument fails because they have the right to appeal this Court's decision in this case to the Court of Appeals for the Federal Circuit. Should the Federal Circuit decide to reverse and remand in the Commerce Appeal, that court will be an appropriate forum to decide whether this Court's decision on the Commission's remand determination should be remanded as well. This Court would then review the ordered remand determinations. For now, this Court recognizes that, in reviewing a motion to stay proceedings, its "paramount obligation" is to exercise jurisdiction timely in the case properly before it. *See Cherokee Nation of Oklahoma v. United States*, 124 F.3d 1413, 1416 (Fed.Cir. 1997). Therefore, this Court denies Defendant–Intervenors' Motion For Stay.

ume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) Price

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether-

(I) there has been significant price underselling by the imported merchandise as compared with theprice of like products of the United States, and (II) the effect of imports of such merchandiseotherwise depresses prices to a significant degreeor prevents price increases, which otherwise wouldhave occurred, to a significant degree.

(iii) Impact on affected domestic industry

In examining the impact required to be considered under subparagraph (B)(iii), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to-

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,(II) factors affecting domestic prices,(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and (IV) actual and potential negative effects on theexisting development and production efforts of the domestic industry, including efforts to develop aderivative or more advanced version of the like product.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C).

The statute requires the Commission to evaluate:

1) whether the volume of the LTFV imports is significant; 2) whether price underselling by the LTFV imports is significant; and 3) whether domestic price depression or suppression caused by the LTFV imports is significant. *Id.* "Significant" is defined as "having or likely to have influence or effect[;] deserving to be considered[;] important, weighty, notable[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 2116 (1993). In assessing the third factor, impact, the Commission evaluates the bearing of the volume and price effects on the domestic industry, *see* S.Rep. No. 100–71, 100th Cong., 1st Sess. at 116 (1987)("A sound determination of material injury cannot be made unless there is a thorough analysis of the volume of imports, the price effects of those imports, and the impact which imports at that volume and at such prices are having on domestic producers."); *see also Timken Co. v. United States,* 20 CIT ——, 913 F.Supp. 580, 588 (1996); *Iwatsu Electric Co., Ltd. v. United States,* 15 CIT 44, 51, 758 F.Supp. 1506, 1512 (1991), and routinely determines whether the adverse impact is significant as well. *See Angus Chemical Co. v. United States,* 140 F.3d 1478, 1482 (Fed.Cir.1998); *General Motors Corp. v. United States,* 17 CIT 697, 700, 827 F.Supp. 774, 779 (1993); *American Spring Wire Corp. v. United States,* 8 CIT 20, 23–24, 590 F.Supp. 1273, 1277 (1984), *aff'd sub nom, Armco Inc. v. United States,* 3 Fed. Cir. (T) 123, 760 F.2d 249 (1985).

Thus, after assessing whether the volume, price effects, and impact of the LTFV imports on the domestic industry are significant,[7] the Commission must take an analytically distinct step to comply with the "by reason of" standard: the Commission must determine whether these factors as a whole indicate that the LTFV imports themselves made a material contribution to the injury.[8]

---

**7.** The presence or absence of any factor is not dispositive to a finding of material injury. *See* 19 U.S.C. § 1677(7)(E)(ii); Moreover, the Commission has discretion to weigh the significance of each factor in light of the circumstances. *Iwatsu Electric Co.,* 15 CIT at 49, 758 F.Supp. at 1510–11.

**8.** The Senate Report to the Trade Agreements Act of 1979 states that, in determining whether material injury occurred by reason of LTFV imports, the issue is not "whether [LTFV] imports are the principal, a substantial, or a significant cause of material injury." S.Rep. No. 96–249, 96th Cong., 1st Sess. at 74 (1979). A subsequent Senate Report, however, diminishes the force of this isolated statement. The Senate Report to

*Cf. General Motors,* 17 CIT at 712, 827 F.Supp. at 788 (upholding the Commission's negative determination where "[t]he factors to which the plaintiffs point[ed] as demonstrating injury [did] not amount to evidence of a significant contribution by the subject merchandise to material injury"). Therefore, proper adherence to the causation analysis incorporated in the statute prevents the Commission from finding material injury by reason of LTFV imports where their contribution to overall harm is *de minimis* (e.g., minimal or tangential).

Our next question, then, is whether the Commission reconsidered its material injury finding in a way that is consistent with this legal standard.

## STANDARD OF REVIEW

The Court will uphold a Commission determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i)(1994).

## DISCUSSION

1. *On remand, did the Commission reconsider its material injury finding in a way that is consistent with the "by reason of" standard?*

 On remand, the Commission found by a two to one majority that an industry in the United States was not materially injured by reason of imports of pure magnesium from Ukraine. *See* Remand (Commission's Determination on Remand)(List 1R, Doc. 132). Therefore, the Court here assesses whether the two majority members, Vice Chairman Marcia E. Miller and Commissioner Carol T. Crawford, reasonably interpreted the "by reason of" standard as articulated by the

---

the Omnibus Trade Act of 1987 states that the amendments to 19 U.S.C. § 1677(7)(B)-(C) were enacted to clarify current law and original Congressional intent. *See* S.Rep. No. 100–71, 100th Cong., 1st Sess. at 115–16 (1987). This Senate Report indicates a stricter stance on causation. First, it clarifies that, *"in every case,* the Commission is required to consider all three factors of volume, price, and impact." *Id.* at 115 (emphasis added). Second, the report indicates that, when "determining the effect of [LTFV] imports on the domestic industry," the Commission must ask whether the imports "are *materially* injuring the domestic industry[,]" *id.* at 116 (emphasis added), supporting the requirement of a material contribution to the overall harm by the LTFV imports themselves.

The Senate Report to the Trade Agreements Act of 1979 also states that the "law does not ... contemplate that the effects from [LTFV] imports be weighed against the effects associated with other factors[.]" S.Rep. No. 96–249, 96th Cong., 1st Sess. at 74 (1979). *See also Citrosuco Paulista v. United States,* 12 CIT 1196, 1228, 704 F.Supp. 1075, 1101 (1988)(holding that the Commission may not weigh causes, and an affirmative injury determination is warranted if LTFV imports contribute even minimally); *Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1026, 728 F.Supp. 730, 740 (1989)("The Commission is not to weigh causes of injury, but is to determine whether the dumped imports contribute to material injury."). The Federal Circuit, however, declined to endorse the 1979 Senate Report. *See Gerald Metals,* 132 F.3d at 722. *But see LMI–La Metalli Industriale, S.p.A. v. U.S.,* 13 CIT 305, 321, 712 F.Supp. 959, 971 (1989)("In determining material injury by reason of imports under investigation, the Commission is not to weigh causes of injury[.]"), *aff'd,* 8 Fed. Cir. (T) 157, 912 F.2d 455 (1990). The Federal Circuit decision in *Gerald Metals* was not an *en banc* decision.

Frequently, several events—each of which is a necessary antecedent and has an appreciable effect—contribute to overall injury to an industry. In some cases, another event may have such a predominant effect in producing the harm as to make the effect of the LTFV imports insignificant and, therefore, to prevent the LTFV imports from being a material factor. (This is not to say, however, that there may not be more than one material factor to injury.) In addition, even if no contributing factors independently have a predominant effect, their combined effect may dilute the effect of the LTFV imports, preventing the LTFV imports from being a material factor. The statute requires that the Commission determine whether the LTFV imports *themselves* made a material contribution to the injury suffered by the domestic industry. *Cf. U.S. Steel Group v. United States,* 18 CIT 1190, 1211–12, 873 F.Supp. 673, 694 (1994)(declining to extend causation test propagated by the court in *British Steel Corp. v. United States,* which held that "[t]he statute's causation prerequisite to an affirmative determination is satisfied if the ... imports contribute, even minimally, to the conditions of the domestic industry[.]" 8 CIT 86, 96, 593 F.Supp. 405, 413 (1984), *aff'd,* 96 F.3d 1352 (Fed.Cir.1996)). *But see Grupo Industrial Camesa v. United States,* 18 CIT 461, 465, 853 F.Supp. 440, 444 (1994)(relying on *British Steel*'s minimal contribution test), *aff'd,* 85 F.3d 1577 (Fed. Cir.1996).

Federal Circuit. The Court notes that the antidumping statute on its face does not compel a single method for analyzing causation, so long as the requirements of 19 U.S.C. § 1677(7)(B)-(C) are met. *See U.S. Steel Group*, 96 F.3d at 1362.

## A. Vice Chairman Miller [9]

In discussing the "by reason of" standard, Vice Chairman Miller notes that the Commission is required to "consider the volume of subject imports, their effect on prices for the like product, and their impact on domestic producers of like product." Remand at 4 (Views of Vice Chairman Miller)(List 1R, Doc. 132). Moreover, in her evaluation of the three mandatory factors, Vice Chairman Miller specifically addresses whether each one is significant. *See id.* at 7, 13, and 15. Because Vice Chairman Miller finds each of the three factors to be insignificant, however, it is impossible to say whether she would have taken the analytically distinct step of determining whether the factors as a whole indicate that the LTFV imports themselves made a material contribution to material injury. Still, Vice Chairman Miller does state that she "agree[s] that the 'by reason of' test requires evidence that subject imports contribute more than 'minimally or tangentially' to any material harm being suffered by the industry." *Id.* at 5. Therefore, the Court concludes that her interpretation of the "by reason of" standard is permissible and, therefore, in accordance with law.

## B. Commissioner Crawford [10]

In her discussion of the legal standard, Commissioner Crawford also notes that the statute mandates consideration of the LTFV imports' volume, price effects, and impact on the domestic industry. *See* Determination at 41 (Views of Commissioner Crawford)(List 1, Doc. 106)(citing 19 U.S.C. § 1677(7)(B)(i)). Moreover, in her evaluation, Commissioner Crawford specifically addresses the significance of each. *See id.* at 47–49.

Crawford's interpretation of the legal standard also complies with the analytically distinct step of determining whether the factors as a whole indicate a material contribution from LTFV imports themselves because her test requires that the LTFV imports *independently* cause a material injury.[11] *See* Remand at 22 (Views of Commissioner Crawford)(List 1R, Doc. 132). Commissioner Crawford rightfully notes that overall "[i]njury to an industry often occurs as a result of a number of different causes," each of which may separately result in material injury. *Id.* at 22–23. Her analysis ensures that the LTFV imports' contribution to the injury overall is material by requiring that their contribution independently cause, at a minimum, a material injury. *Cf.* S.Rep. No. 100–71, 100th Cong., 1st Sess. at 116 (1987)("When determining the effect of imports on the domestic industry, the Commission must consider all relevant factors that can demonstrate if unfairly traded imports are *materially* injuring the domestic industry.")(emphasis added). Therefore, the Court finds Commissioner Crawford's causation analysis to be a reasonable interpretation of the "by reason of" standard and in accordance with law.

---

**9.** Vice Chairman Miller was not a member of the Commission at the time of the original determination, which made an affirmative determination by a three to three vote. Vice Chairman Miller therefore considers the record *de novo*.

**10.** Commissioner Crawford, who dissented in the original determination, states that she believes her legal analysis comports with the Federal Circuit's standard. *See* Remand at 23 (Views of Commissioner Crawford)(List 1R, Doc. 132). Therefore, upon remand, she incorporates her findings, analysis, and views from the original investigation. *See id.*

**11.** In her causation analysis, Commissioner Crawford isolates the effects of the LTFV imports by comparing "the state of the industry when imports were dumped with what the state of the industry would have been if the imports had not been dumped." Remand at 23 (Views of Commissioner Crawford)(List 1R, Doc. 132). If she finds that the domestic industry would have been materially better off had the subject imports been priced fairly, she concludes that there is material injury by reason of the LTFV imports. *See* Determination at 42 (Views of Commissioner Crawford)(List 1R, Doc. 106). The Federal Circuit has specifically upheld Crawford's method of causation analysis. *See U.S. Steel*, 96 F.3d at 1362.

2. *Is the Commission's remand determination that an industry in the United States was not materially injured by reason of imports of pure magnesium from Ukraine supported by substantial evidence and otherwise in accordance with law?*

### A. Convertibility of the Russian Imports

■ This case presents a unique situation in that all Russian imports of pure magnesium originated from only two producers, and the individual trading company exporting to the United States—not the producer—set the prices that determined whether Russian magnesium was fairly traded or LTFV. The finding of convertibility is crucial to the analysis of material injury by reason of LTFV imports. The Federal Circuit held that,

> [w]hile the statute protects domestic magnesium producers from injury caused by LTFV imports, its scope of protection does not reach so far as to support artificially inflated prices when fairly-traded imports are under selling the domestic product and LTFV imports are readily convertible to fairly-traded product by merely changing importers.

*Gerald Metals,* 132 F.3d at 722. Moreover, the Federal Circuit concluded that, "[w]ithout further explanation, [it could not] adequately review the Court of International Trade's dismissal of the prospect that fairly-traded goods would have replaced the LTFV goods." *Id.* at 721. On remand, the Commission majority finds that the Russian fairly-traded and LTFV imports were convertible. *See* Remand at 5 (Views of Vice Chairman Miller) and at 21–22 (Views of Commissioner Crawford)(List 1R, Doc. 132).[12] As a threshold matter, the Court here evaluates whether the Commission's finding of convertibility is supported by substantial evidence.

The Commission majority finds that, except for the dumping, the fairly-traded and LTFV magnesium imports were identical

products. *See id.* at 12 (Views of Vice Chairman Miller); Determination at 45 (Views of Commissioner Crawford) (List 1, Doc. 106). In addition, Commissioner Crawford finds "no evidence on the record to indicate any product differentiation, non-price differences or differences in terms and conditions of sale between dumped Russian imports and fairly traded Russian imports." Determination at 45 (Views of Commissioner Crawford)(List 1, Doc. 106). These findings support the conclusion that the Russian LTFV and fairly-traded imports of pure magnesium were fully convertible.

On remand, the Commission also obtained additional information supporting the conclusion of convertibility. The Commission sent a questionnaire addressing the subject of convertibility to eleven firms that had reported importing pure magnesium from Russia during the period of investigation. All six responding firms "reported that pure magnesium from Russian LTFV sources was used interchangeably with pure magnesium from Russian fairly-traded sources." Memorandum INV–V–047 (June 15, 1998)(List 2R, Doc. 53)("Memorandum"). Moreover, the responding importers unanimously reported "that there were no differences in sales terms or delivery between pure magnesium imported from Russian LTFV and Russian fairly-traded sources." *Id.* The importers were also asked whether there were any constraints (e.g., supply contracts or agreements) on their ability to switch suppliers of pure magnesium. Four importers responded to this question, answering "that there were no constraints on their ability to shift suppliers." *Id.* Finally, the Commission sent questionnaires to the two Russian producers of pure magnesium, and the responding producer reported that its ability to switch among trading companies for exporting magnesium to the United States was unrestricted. *Id.*

Despite these findings, the Defendant–Intervenors (Magnesium Corporation of America, et al.) argue that "the record evidence

---

12. Commissioner Crawford found the Russian LTFV and fairly traded imports to be convertible in her original dissenting determination. *See* Determination at 45 (Views of Commissioner Crawford) (List 1, Doc. 106). She therefore adopts her findings, analysis, and views from the original investigation on remand. *See* Remand at 21–22 (Views of Commissioner Crawford)(List 1R, Doc. 132).

indicates that the LTFV imports could *not* have been converted to fairly traded Russian imports during the [period of investigation], because there was an inadequate supply of fairly traded Russian imports and because other factors constrained any such conversion." Def.-Intervenors' Comments on ITC Determ. on Remand at 4. First, Defendant–Intervenors argue that the Plaintiff relies on the assumption that fairly-traded Russian imports would replace all or the greatest part of the subject imports. *See id.* at 5. On remand, however, the Commission majority did not find that LTFV imports did not have *any* adverse effects on the domestic industry, but that they did not have any *significant* effects. Therefore, a negative finding is not contingent upon the complete displacement of LTFV imports by Russian fairly-traded imports.

Moreover, Defendant–Intervenors argue that, because the two Russian producers did not have additional pure magnesium to sell, the nine fairly-trading companies would not have had access to extra magnesium to cover the Russian LTFV imports sold to the United States during the period of investigation. *Id.* at 7–8. As the Commission points out, however, this supply limitation argument mistakenly assumes that purchasers would need to find additional metric tons of pure magnesium over and above the combined LTFV and fairly-traded Russian magnesium that was sold in the United States. *See* Def. U.S. ITC Response to Comments on Comm'n Remand Determ. at 23. Given their near perfect substitutability and the absence of physical or contractual restraints on switching sources, the conclusion that LTFV Russian sales could be converted to fairly traded sales is reasonable. *See id.* at 23.

> Defendant–Intervenors also argue that, even if the nine fairly trading sources had access to an adequate supply [of Russian pure magnesium], there is no evidence that these nine sources had the business relationships, personnel and other resources necessary to negotiate and complete the purchase and resale of [substantial] additional [amounts] of fairly traded Russian magnesium and to ship that material to the United States.

Def.-Intervenors' Comments on ITC Determ. on Remand at 9. As meritorious as this argument may be, however, record evidence also supports the opposite conclusion. Between 1992 and 1993, the fairly-trading Russian companies increased their volume of exports to the United States exponentially. *See Staff Report to the Commission on Investigations Nos. 731–TA–696–698,* (List 2, Doc. 37) (April 20, 1994), C.R. at I–46, Table 23 ("Staff Report"). If they maintained the "business relationships, personnel, and other resources" to exponentially increase their export volumes once, the Commission may reasonably conclude these traders could do so again. *See* Def. U.S. ITC Response to Comments on Comm'n Remand Determ. at 30. This conclusion is reinforced by the evidence showing that there were no restrictions on the Russian producers' ability to switch among trading companies for export to the United States. *See* Memorandum.

Moreover, record evidence showing that shifting from Russian LTFV sources to Russian fairly-trading sources actually took place during the period of investigation further discounts Defendant–Intervenors' argument that conversion could not have taken place because of supply constraints and other restrictions. On remand, the Commission asked the firms importing from Russia whether their firms had shifted any of their imports from Russian LTFV sources to Russian fairly-trading sources during the period of investigation. *See* Memorandum. Two of the responding firms reported that they had shifted imports. *See id.*

Defendant–Intervenors, however, argue that the importers' actual written responses "show that the remand investigation actually did not uncover a single instance of shifting from LTFV imports to fairly-traded Russian imports during the period of investigation." Def.-Intervenors' Comments on ITC Determ. on Remand at 12. Defendant–Intervenors point to one of the responding importer's narrative answers, which states that the firm imported magnesium from LTFV sources and then sold that magnesium to companies that were found to be fairly trading magnesium. *See id.* at 14. (citing a Remand Importer Questionnaire at 2 (List 2R, Doc. 48)(June

1, 1998)). Thus, Defendant–Intervenors argue that "[s]uch a sale does not alter the LTFV character of the [responding firm's] imports." *Id.* This argument does not disprove convertibility. The fact remains that the LTFV imports sold by the responding firm were later deemed to be fairly-traded upon the sale to a different trading company. Thus, the purchasing company was able to convert Russian LTFV imports to fairly-traded imports.

Defendant–Intervenors also point to a telephone interview with the second responding importer. *See id.* (citing Comm'n Staff Notes (List 2R, Doc. 45)(June 1, 1998)("Staff Notes")). In the interview, a company representative stated that the importer, "did shift and start buying from different sources[,]" and that it "did shift between different Russian suppliers because it was a fairly trading [company]." *Id.* Defendant–Intervenors argue that, because the company was deemed to be selling at fair value Russian magnesium supplied by both Russian producers, its shifts were not shifts from LTFV to fairly-trading Russian sources. *See* Def.Intervenors' Comments on ITC Determ. on Remand at 14 (citing *Notice of Antidumping Duty Orders: Pure Magnesium From the People's Republic of China, the Russian Federation and Ukraine,* 60 Fed.Reg. 25,691, 25,692 (Commerce, May 12, 1995)).

In rebuttal, the Commission notes that the finding that the importer sold both Russian producers' merchandise on a fairly-traded basis resulted from the May 1995 amendment to the final determination. *See* Def. U.S. ITC's Response to Comments on Comm'n's Remand Determ. at 33. According to the Commission, Commerce's original final determination in March 1995 assigned the importer a dumping margin for its purchases from one of the Russian producers and a zero margin for the other. *See id.* at 33–34 (citing *Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium and Alloy Magnesium From the Russian Federation,* 60 Fed.Reg. at 16,449 (Commerce, Mar. 30, 1995)). Thus, argues the Commission, there was a period during which the importer's dumping margin differed depending on the identity of the supplying Russian producer. *See id.* at 34. The Commission concludes that "[t]he most logical interpretation of its statement to the Commission staff is that during this period, [the importer] switched its purchases to a producer whose products would not be subject to duties." *Id.* Thus, the importer shifted its purchases from LTFV to non-LTFV sources.

Therefore, based on the whole record before it and having taken into account contradictory evidence, the Court concludes that substantial evidence supports the Commission's finding of convertibility between Russian LTFV and fairly-traded imports. Although Defendant–Intervenors drew opposite conclusions, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Moreover, "[i]t is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence."[13] *Maine*

---

**13.** In addition to arguing that substantial evidence does not support the Commission's finding of convertibility, Defendant–Intervenors argue that the Commission has no legal basis for hypothetically converting LTFV imports that were present in the United States during the period of investigation into fairly-traded imports for purposes of causation analysis. *See* Def.-Intervenors' Comments on ITC Determ. on Remand at 4. This argument, however, directly contravenes the Federal Circuit's holding, which required the Commission to consider the convertibility of the LTFV and Russian fairly-traded imports. *See Gerald Metals,* 132 F.3d at 721–22; *see also R–M Industries, Inc. v. United States,* 18 CIT 219, 227,

848 F.Supp. 204, 211 (1994)(affirming that individual Commissioners may consider in their injury determinations whether fairly-traded imports would have replaced LTFV imports if the LTFV imports were absent from the market). Moreover, Defendant–Intervenors argue that speculation regarding purchasers potentially shifting fairly-traded imports is not permissible under the statute. *See* Def.-Intervenors' Comments on ITC Determ. on Remand at 4. Contrary to their assertion, however, the statute can reasonably be interpreted to require the Commission to determine whether price suppression would occur in the absence of LTFV imports. 19 U.S.C. § 1677(7)(C)(ii)(II).

*Potato Council v. United States,* 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985).

Having resolved this threshold issue, the Court evaluates whether the Commission majority's individual determinations are supported by substantial evidence.

## B. Views of Vice Chairman Miller
### i) Volume of LTFV Imports

Vice Chairman Miller first evaluates whether the volume of LTFV imports are significant pursuant to 19 U.S.C. § 1677(7)(C)(i). She notes that the volume of the subject imports increased sharply from 1992 to 1993, but then decreased significantly in 1994. *See* Remand at 6 (Views of Vice Chairman Miller)(List 1R, Doc. 132)(citing Staff Report, Table 24, C.R. at I–48). She finds that the value of the cumulated LTFV imports followed a similar trend over the same period. *See id.* (citing Staff Report, Table 1, C.R. at I–16). Meanwhile, she finds that the domestic share of the pure magnesium market contrasted, decreasing sharply from 1992 to 1993, but regaining "considerable" market share in 1994. *See id.* at 6–7 (citing Staff Report, Table 24, C.R. at I–48).

Despite these findings, Vice Chairman Miller concludes "that the volume of subject imports, either absolutely or relative to production or consumption, is not, at present, significant." *Id.* at 7. Although she notes that the Commission's preliminary affirmative determination in May 1994 may have contributed in part to the LTFV imports' substantial decrease in volume that year,[14] Vice Chairman Miller finds what she believed to be more "compelling" reasons. First, she finds most important that the large increase in subject imports in 1993 resulted from the liquidation of former Soviet stockpiles of pure magnesium that year, which appeared, in her view, to be "an unusual, short-term event." *See id.* at 7 (citing Staff Report, C.R. at I–8). In addition, she finds that Russian imports shifted to other markets, such as Western Europe and Asia, where selling terms had improved significantly. *See id.* (citing Prehearing Br. on Behalf of Russian Producers, (List 2, Doc. 18)(March

22, 1995), C.R. at 13, 17(n.13), and 26 ("Prehearing Br.")). Finally, Vice Chairman Miller notes the Ukrainian government's decision to allocate more magnesium to domestic consumption. *See id.* (citing Tr. of Proceedings Before the ITC, (List 1, Doc. 73)(March 28, 1995), at 186–87).

In addition, Vice Chairman Miller notes that "the presence of a large and growing volume of fairly traded imports from Russia" further diminished the significance of the volume of the subject imports. *See id.* at 8. The volume of fairly-traded Russian imports increased exponentially from 1992 to 1993 and remained high in 1994. *See* Staff Report, Table 23, C.R. at I–46. The volume of Russian LTFV imports, however, decreased substantially from 1993 to 1994. *See id.*

Based on these findings, the Court holds that Vice Chairman Miller's conclusion that the volume of LTFV imports presently was not significant is supported by substantial evidence. While the Commission's preliminary affirmative determination in May 1994 may have contributed to the substantial decrease in volume of subject imports that year, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo,* 383 U.S. at 620, 86 S.Ct. 1018 (1966).

### ii) Price Effects of LTFV Imports

In evaluating the subject imports' effect on domestic prices of like merchandise, the Commission must consider whether–

(I) there has been significant price underselling by the imported merchandise as compared with the price of like product of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

While Vice Chairman Miller finds that the subject imports undersold domestic pure

---

**14.** In dissent, Chairman Bragg chooses not to rely on data for the second half of 1994 for this reason. *See* Remand at 32 (Dissenting Views of Chairman Lynn M. Bragg)(List 1R, Doc. 132).

magnesium in seventeen of twenty-one possible comparisons, *see* Remand at 9 (Views of Vice Chairman Miller)(List 1R, Doc. 132)(citing Staff Report, Table 27, C.R. at I-62), she concludes that the significance of this underselling was mitigated by product differentiation, quality differences, and other non-price factors. *See id.* Thus, Vice Chairman Miller concludes that the subject and domestic imports were "only moderately interchangeable." *Id.* About half of the parties found the Chinese and Ukrainian imports to be inferior to the domestic product. *See id.* at 9–10 (citing Staff Report, C.R. at I-54). Moreover, many purchasers indicated that the smaller size of the LTFV pure magnesium ingots was a disadvantage because of ensuing melt loss. *See id.* at 10 (citing Staff Report, C.R. at I-54). Finally, many purchasers noted that the domestic suppliers were generally more reliable in terms of supply and delivery. *See id.* (citing Staff Report, C.R. at I-55).

Regarding price depression, Vice Chairman Miller notes that domestic prices increased in 1993, when LTFV imports were at their highest levels, and remained high in 1994, when the volumes of LTFV imports had declined. *See id.* at 10–11 (citing Staff Report, Table 25–26, C.R. at I-57 and I-60). Therefore, Vice Chairman Miller concludes that the subject imports did not depress prices to a significant degree. *See id.* at 11. Substantial record evidence supports her claim.

Regarding price suppression, Vice Chairman Miller concludes that "competitive conditions in the domestic market restrained the ability of the domestic industry to raise prices and, therefore, LTFV imports did not suppress prices to a significant degree." *Id.* at 11. Vice Chairman Miller finds the large and growing presence of substitutable fairly-traded Russian imports to be most significant in impeding the domestic industry's ability to raise prices. *See id.*

In dissent, Chairman Bragg notes that "at least some portion of both LTFV and fairly-traded imports that originated from the liquidated Russian stockpile were of lesser quality or at least less reliable in terms of quality and continuity of supply than the U.S. product." Remand at 34 (Dissenting Views of Chairman Bragg)(List 1R, Doc. 132)(citing Staff Report, C.R. at I-54). Based on this information, Chairman Bragg concludes that "those end users for whom quality and reliability of supply were the most important factor were unlikely able to opt out of their contracts with [domestic producers] in order to purchase relatively small quantities of LTFV imports. Thus, [domestic producers'] prices could not move in response to imports." *Id.* Rather than refute Vice Chairman Miller's conclusion that price suppression did not occur, however, Chairman Bragg's argument supports the finding; evidence that the domestic product did not compete with some Russian imports supports the conclusion that the subject imports did not impede the domestic industry's ability to raise prices.

In addition, Chairman Bragg notes that an increase in unit cost of goods sold ("COGS") experienced by the domestic industry during the period of investigation forced domestic producers to increase prices, limiting the visible price suppressing effects of the LTFV imports. *See id.* at 33–34. Vice Chairman Miller, however, points out that the ratio of domestic COGS to domestic net sales decreased between 1992 and 1993, when the volume of subject imports was increasing, and increased in 1994, when the volume of subject imports was decreasing. *See id.* at 13 (Views of Chairman Miller)(citing Staff Report, Table 9, C.R. at I-29). In sum, because Vice Chairman Miller does not find clear evidence of a cost-price squeeze, she concludes that price suppression could not be attributed to the LTFV imports to a significant degree. *See id.*

Thus, Vice Chairman Miller concludes that the LTFV imports were not the cause of significant domestic price effects. *See id.* Although inconsistent conclusions from the record may be drawn, the Court finds her conclusion to be supported by substantial evidence.

### iii) Impact of LTFV Imports on Domestic Industry

With regard to the impact of subject imports on the domestic industry, Vice Chairman Miller notes that, pursuant to the statute, she considers "all relevant economic

factors" that bear on the state of the industry, including "output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, and research and development." *Id.* (citing 19 U.S.C. § 1677(7)(C)(iii)).

Vice Chairman Miller finds that, although "the domestic industry experienced declines in production, shipments, employment and net sales as the volume of LTFV imports increased[,] ... the industry also exhibited improved financial performance overall." *Id.* at 14 (citing Staff Report, Table 9, C.R. at I–29). Moreover, the domestic industry's financial performance improved when the volume of LTFV imports increased and worsened as the volume of LTFV imports decreased. *See id.* (comparing Staff Report, Table 9, C.R. at I–29, with Table 1, C.R. at I–16, Table 25, C.R. at I–57, and Table 26, C.R. at I–60). In addition, Vice Chairman Miller notes that while the industry endured certain losses throughout the period of investigation, aggregate industry losses had decreased substantially by 1994. *See id.* at n. 59 (citing Staff Report, Table 9, C.R. at I–29). The Court finds Vice Chairman Miller's conclusions regarding impact to be reasonable because no factor in the analysis is dispositive. *See* 19 U.S.C. § 1677(7)(E)(ii); *see also Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985)("It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence.").

Discussing financial performance in dissent, however, Chairman Bragg points out that, of the three domestic producers, Northwest Alloys "sells its magnesium to a related company and therefore its data are somewhat misleading regarding sales in the U.S. market because they do not represent arms-length transactions." Remand at 35 (Dissenting Views of Chairman Bragg). While perhaps somewhat damaging to Vice Chairman Miller's conclusion, this information also suggests that only two out of three domestic producers could have been injured by the LTFV imports because Northwest Alloys did not even compete with these imports.

Of the two remaining domestic producers, Chairman Bragg notes that Dow Chemicals performed poorly, having to close one of its plants at the same time the volume of LTFV imports peaked. *See id.* at 35. While it is true that a Dow official testified at the Commission's hearing that the LTFV imports were, at least partially, the reason for the plant closure, *see* Tr. of Proceedings Before the ITC, (List 1, Doc. 73)(March 28, 1995), at 31–32, Vice Chairman Miller finds the evidence concerning this claim to be mixed. *See* Remand at 15 (Views of Chairman Miller)(List 1R, Doc. 132). Vice Chairman Miller believes that Dow's testimony was undercut by the firm's earlier press release of November 28, 1994, which stated, "the decision to close Plant B is based on the company's long-term projections of the magnesium industry; not on the short-term conditions of today's magnesium marketplace ... Dow will focus its resources on keeping a single facility in world-class condition[.]" *Id.* (citing Staff Report, C.R. at I–18). In addition, the press release indicates that Dow would be expanding the capacity of its single operating plant. *See id.* Finally, Vice Chairman Miller concludes that, to the extent the decision was based on import competition, it appeared to be based on competition from the Russian fairly-traded imports, as well as LTFV. *See id.* at 15–16. Because "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence[,]" *Consolo*, 383 U.S. at 620, 86 S.Ct. 1018, the Court finds Vice Chairman Miller's conclusion to be reasonable.

Vice Chairman Miller also concludes that the Dow plant closure caused the overall industry decline in capacity and employment. *See id.* at 15. Based on her finding that the LTFV imports were not an important cause of the plant closure, the significance of these factors is then discounted.

Having taken into account contradictory evidence, the Court finds Vice Chairman Miller's conclusion that the LTFV imports did not have a significant adverse impact on the

domestic industry to be supported by substantial evidence.

#### iv) Conclusion

The Court finds Vice Chairman Miller's determinations that the volume, price effects, and impact of the LTFV imports were not significant to be supported by substantial evidence on the record. Thus, the Court affirms her finding of no material injury by reason of LTFV imports.

### C. Views of Commissioner Crawford
#### i) Volume of LTFV Imports

As a preliminary matter, Commissioner Crawford finds that there was significant competition in the United States among domestic producers, producers of nonsubject imports, and producers of fairly-traded Russian imports. *See* Determination at 46 (Views of Commissioner Crawford)(List 1, Doc. 106). She then notes that in terms of both quantity and value, the market share of the LTFV imports increased dramatically from 1992 to 1993, but then decreased substantially from 1993 to 1994. *See id.* at 46–47 (citing Staff Report, Table A–6, C.R. at A–18). Commissioner Crawford concludes that, "[b]ased on the small market share of subject imports in 1994 and the conditions of competition in the domestic magnesium market, I find that the volume of subject imports is not significant in light of its price and volume effects." [15] *Id.* at 47.

Based on these findings from the record, the Court finds Crawford's conclusion that the volume of subject imports was not presently significant to be supported by substantial evidence.

#### ii) Price Effects of LTFV Imports

Because there was no evidence of price depression—since domestic prices increased in 1993 and remained high in 1994—Commissioner Crawford discusses price suppression in detail. *Id.* at 47–48. Pursuant to 19 U.S.C. § 1677(7)(C)(ii)(II), Commissioner Crawford analyzes whether domestic prices would have increased in the absence of the LTFV imports. In making her analysis, Commissioner Crawford examines demand conditions (i.e., whether purchasers would have been willing to pay higher prices for the domestic product) and supply conditions (i.e., whether available capacity and competition in the market would have imposed discipline and prevented price increases for the domestic product) in the United States. *Id.* at 47.

First, Commissioner Crawford assumes that if the subject imports had not been dumped, "they would [have] become more expensive relative to domestic magnesium, fairly traded Russian imports and nonsubject imports." *Id.* at 47. Because the dumping margins for Chinese and Ukrainian imports were very large, Commissioner Crawford assumes that, at fairly-traded prices, imports from these countries "would have been priced out of the market." *Id.* She then gives the domestic industry the benefit of the doubt by "assum[ing] that the entire demand for [Chinese and Ukrainian] imports would have shifted to domestic magnesium." *Id.* Because these two countries held a very small domestic market share in 1994, however, Commissioner Crawford concludes that the "shift in demand to domestic magnesium would have been very small." *Id.*

Because Russian LTFV and fairly-traded imports of pure magnesium were found to be perfect substitutes, and there were no constraints on shifting, Commissioner Crawford concludes that "purchasers would have converted the dumped Russian imports into fairly traded imports by purchasing them through [fair] trading companies." *Id.* at 48. Therefore, she concludes that instead of decreasing, demand for subject Russian imports would have simply shifted to fairly-traded Russian imports. *Id.* Therefore, Commissioner Crawford concludes that the "overall increase in demand for domestic

---

**15.** As discussed above, Chairman Bragg chooses to not rely on data for the second half of 1994 because she believes there was a significant connection between "the virtual cessation of LTFV imports" and the Commission's May 1994 preliminary affirmative determination. *See supra* note 14 and accompanying text. The Court, however, finds substantial evidence to support Vice Chairman Miller's conclusion that there were "more compelling" reasons for the LTFV imports' decline in volume in 1994. Therefore, the Court finds Crawford's focus on the volume of LTFV imports in 1994 to be reasonable. *See id.*

magnesium would have been very small." *Id.*

Finally, because of significant competition in the United States—between domestic producers, nonsubject imports, and fairly-traded Russian imports—and excess domestic production capacity,[16] Commissioner Crawford determines that "[p]rice increases would not have stuck even without unfairly priced subject imports." *Id.* Consequently, Commissioner Crawford finds that "subject imports [were] not having significant effects on prices for domestic magnesium." *Id.*

Based on these findings, the Court finds that Crawford's conclusion regarding the lack of significant price effects is supported by substantial evidence.

### iii) Impact of LTFV Imports on Domestic Industry

In evaluating the impact of the subject imports on domestic producers, Commissioner Crawford first acknowledges that she is required by statute to consider "output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, research and development[,] and other related factors." *Id.* (citing 19 U.S.C. § 1677(7)(C)(iii)). Because these factors "either encompass or reflect the volume and price effects of the dumped imports," Commissioner Crawford "gauge[s] the impact of dumping through those effects." *Id.; see also* S.Rep. No. 100–71, 100th Cong., 1st Sess. at 116 (1987)("A sound determination of material injury cannot be made unless there is a thorough analysis of the volume of imports, the price effects of those imports, and the impact which imports at that volume and at such prices are having on domestic producers."). Moreover, under Crawford's analysis, "[u]nderstanding the impact on the domestic industry's prices,

sales[,] and overall revenues is critical to determining the state of the industry, because the impact on other industry indicators (e.g., employment, wages, etc.) is derived from the impact on the domestic industry's prices, sales, and revenues." *Id.* at 42.

In her determination, Commissioner Crawford restates her finding that "the domestic industry would not have been able to increase its prices if subject imports had been sold at fairly traded prices." *Id.* at 48 (*see supra* p.35–36). In addition, Commissioner Crawford restates her finding that the overall increase in demand for domestic magnesium would have been "very small." *Id.* (*see supra* p.35). Consequently, Commissioner Crawford concludes that the domestic industry's increase in output and sales, and therefore its revenues, would have been insignificant. *See id.*

Based on these findings, Commissioner Crawford concludes that, because "the domestic industry would not have been able to increase its prices, output or sales, and revenues significantly[,] ... the domestic industry would not have been materially better off if the subject imports had been fairly traded." *Id.* at 49. Therefore, Commissioner Crawford concludes that the LTFV imports did not have a significant adverse impact on the domestic industry. *Id.*

Based on these findings, the Court finds Crawford's conclusion that the impact of subject imports was not presently significant to be supported by substantial evidence.

### iv) Conclusion

The Court finds Crawford's determinations that the volume, price effects, and impact of the LTFV imports were not significant to be supported by substantial evidence on the record. Thus, the Court affirms her finding of no material injury by reason of LTFV imports.[17]

---

**16.** In 1994, the domestic industry had fourteen percent of unused capacity, *see* Determination at 46 (Views of Commissioner Crawford)(List 1, Doc. 106)(citing Staff Report, Table A–3, C.R. at A–10 to A–11), which exceeded the total quantity of subject imports that same year. Moreover, Commissioner Crawford notes that the "domestic industry also had substantial inventories available at the end of 1994." *Id.* (citing Staff Report, Table A–3, C.R. at A10 to A–11).

**17.** On remand, the Commission also determined that the domestic industry was not threatened with material injury by reason of imports of pure magnesium from Ukraine. The Commission must make its threat determination pursuant to 19 U.S.C. § 1677(7)(F). The statute enumerates a number of factors the Commission must consider in making its determination. *See* 19 U.S.C. § 1677(7)(F)(i)(I)-(X). The determination must "be made on the basis of evidence that the threat

## CONCLUSION

The Commission's negative determination of material injury is supported by substantial evidence on the administrative record and otherwise in accordance with law. Accord-ingly, the Commission's remand determination is affirmed.

of material injury is real and that actual injury is imminent." 19 U.S.C. § 1677(7)(F)(ii). The "determination may not be made on the basis of mere conjecture or supposition." *Id.* Moreover, the section of the antidumping statute that discusses the factors concerning the threat of injury determination also includes the "by reason of" language. *See* 19 U.S.C. § 1677(7)(F)(ii).

Therefore, the "by reason of" standard also applies to threat determinations.

No party has challenged the Commission's negative threat determination on remand. Therefore, the matter is not at issue before the Court.